**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **DIVISIONS, INC. d/b/a DIVISIONS MAINTENANCE GROUP**<br>50 West Fifth Street<br>Cincinnati, Ohio 45202<br><br>Plaintiff,<br><br>v.<br><br>**L & B GROUNDS MANAGEMENT INC.,**<br>Registered Agent:<br>Laviniu Buzle<br>3130 Duana Drive<br>Milford, Michigan 48380<br><br>**LAVINIU BUZLE**<br>60 Caledonia Road, Apt. 109<br>Asheville, North Carolina 28803<br><br>**Also serve:**<br>Laviniu Buzle<br>3130 Duana Drive<br>Milford, Michigan 48380<br><br>Defendants. | : | Case No.: ____________<br><br>Judge: ______________<br><br>**COMPLAINT** |

For its Complaint against Defendants L&B Grounds Management Inc. and Laviniu Buzle, Plaintiff Divisions, Inc. d/b/a Divisions Maintenance Group states as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Divisions, Inc. d/b/a Divisions Maintenance Group ("DMG" or "Plaintiff") is a Kentucky corporation with its principal place of business in Cincinnati, Ohio.

2. Upon information and belief, Defendant L & B Grounds Management Inc. ("L&B") is a Michigan Corporation with its principal place of business in Milford, Michigan.

3. Upon information and belief, Defendant Laviniu Buzle ("Buzle," and together with L&B, "Defendants") is an individual who resides in Asheville, North Carolina.

4. This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332 and other applicable law.

5. Venue is proper in this Court under 28 U.S.C. § 1391(b)(3) and other applicable laws.

## FACTS

6. DMG oversees property management and maintenance services for a variety of commercial, industrial, and residential organizations. DMG relies on its nationwide network of service providers to perform these services for its clients.

7. L&B is a maintenance company that provides services such as snow removal, plumbing, general handyman repairs, and construction.

8. Buzle is the president, treasurer, secretary, and director of L&B. Upon information and belief, until March 1, 2025, Buzle resided at the same address as the headquarters of L&B.

9. Upon information and belief, Buzle makes all of L&B's decisions, financial or otherwise.

10. Upon information and belief, Buzle has sole control over the movement of L&B's funds.

### The Agreement

11. In July 2022, DMG and L&B entered into that certain Master Provider Agreement (the "Agreement"), which outlined the respective obligations of the Parties, including L&B's obligation to provide labor, materials, and services to DMG's clients on a project-by-project basis. A true and accurate copy of the Master Provider Agreement is attached as Exhibit A.

12. The Agreement contained a Kentucky forum-selection clause because DMG's headquarters, at the time of signing, was located in Newport, Kentucky.

13. DMG then moved its headquarters to Cincinnati, Ohio in June 2023. DMG later required L&B to sign a modified version of the Agreement to continue providing its services to DMG's clients. The modified version of the Agreement contained an Ohio forum-selection clause and superseded all prior versions of the Agreement. L&B signed the modified version of the Agreement in October 2023. The modified version of the Agreement is attached as Exhibit B.

14. The Agreement, among other things, required L&B to perform all its work directly for DMG's clients. L&B's use of subcontractors was "expressly prohibited" without prior written consent from DMG.

**UPS Project**

15. A few years ago, the United Parcel Service ("UPS") issued a Request for Proposal ("RFP") to solicit project and costs proposals for upgrades to industrial fans within various facilities across the Midwest.

16. DMG advised L&B of the RFP and requested that L&B provide a proposal for work encompassed by the RFP.

17. L&B, through Buzle, represented that it visited various sites encompassed by the RFP to compile its proposals for the work required.

18. Between June 2023 and August 2024, L&B provided DMG proposals for work at 23 different UPS facilities in the RFP (collectively, the "Proposal").

19. DMG also conferred with L&B to update the Proposal to reflect adjustments for services DMG would provide. In so doing, DMG relied on L&B's expertise for the technical aspects of the Proposal and the RFP response, including the price of L&B's services to complete

the work for those UPS facilities encompassed by the RFP and the Proposal (collectively, the "Project").

20. DMG did question some of L&B's estimates and prices for work included at various sites in the Proposal. For example, DMG questioned the amount of conduit that L&B proposed to use at some sites. DMG also questioned L&B's overall prices for some of the sites in the Proposal.

21. Through Buzle, L&B assured DMG that the work encompassed in the Proposal was necessary to fulfill UPS's RFP and the sites covered by the Proposal.

22. Sometimes, in response to DMG's inquiries, L&B revised a part of the Proposal and then affirmatively represented that work proposed was necessary to fulfill the RFP and the scope of work for UPS.

23. L&B exploited its relationship with DMG and its purported knowledge of the work in order to convince DMG to award L&B all the work encompassed by the Proposal.

24. DMG submitted the Proposal to UPS. After reviewing the Proposal, UPS awarded DMG (and, in turn, L&B) the work for the Project.

25. L&B began working on the Project in or about late July 2023.

26. As L&B worked on the Project, it periodically provided DMG with estimates for the costs of its services, including labor and materials. L&B would then invoice DMG for substantially the same amount as identified in the estimate. DMG then invoiced UPS, which included the additional costs of DMG's own services. In doing so, DMG relied on L&B's expertise and experiences in determining the cost of its work, consistent with the Proposal that L&B had drafted and on which DMG also had relied. L&B sent DMG its first invoice on June 20, 2023.

27. L&B completed the Project on September 5, 2024. Thereafter, L&B sent its last invoice to DMG on September 29, 2024.

28. In total, L&B invoiced DMG $2,828,163.30 for its services provided on the Project, all of which DMG paid to L&B.

29. In total, DMG invoiced $3,795,368.09 to UPS for the Project, all of which UPS paid to DMG. This included the $2,828,163.30 for which L&B invoiced DMG.

30. UPS paid for DMG's charges in full, and DMG paid L&B in full for all amounts L&B invoiced to DMG.

**UPS and DMG Uncover L&B's Deception**

31. After the completion of the Project, as part of a routine audit, UPS discovered discrepancies between the work performed and the work invoiced by DMG (and in turn L&B).

32. UPS conducted a formal audit on the fans renovated and installed by L&B under the Project. DMG also conducted an independent audit of the work performed.

33. The audits uncovered inconsistencies between the work UPS and DMG could verify as performed by L&B and the work charged by L&B. For example:

a. For one site, L&B charged for 600 units of metallic rigid conduit, but the audits uncovered that it had only used 45 units. A true and accurate copy of the estimate provided by L&B to DMG for this charge is attached as Exhibit C.

b. Even worse, at another site, L&B charged for 700 units of metallic rigid conduit, but the audits uncovered that it had only used 19. A true and accurate copy of the estimate provided by L&B to DMG for this charge is attached as Exhibit D.

c. For yet another site, L&B charged for 44 breakers, but it only used 13. A true and accurate copy of the estimate provided by L&B to DMG for this charge is attached as Exhibit E.

d. And at even another site, L&B charged for 100 spools of 500 foot black wiring, though it only used 35. A true and accurate copy of the estimate provided by L&B to DMG for this charge is attached as Exhibit F.

34. The audits also uncovered that L&B employed subcontractors to perform all of the work it was assigned to do on the Project, in violation of the terms of the Agreement.

35. In total, L&B overcharged DMG (and UPS) for its services on the Project by about $1,500,000.

36. In an effort to remedy the situation and maintain a positive business relationship with UPS, DMG has agreed to reimburse UPS in an amount not less than $1,452,552.08 to compensate UPS for the issues caused by L&B.

37. Upon information and belief, there is a unity of identity between Buzle and L&B.

38. Buzle's control over L&B was so complete that L&B had no separate mind, will, or existence of its own.

39. Buzle's control over L&B was exercised to commit a fraud against DMG, as set forth herein.

40. DMG suffered an injury as a result of Buzle's control of L&B.

## COUNT ONE
## BREACH OF CONTRACT

41. DMG restates and realleges the foregoing paragraphs as if fully restated herein.

42. DMG and L&B entered into a valid and binding Agreement for L&B's services for DMG clients.

43. Among other things, the Agreement prohibited L&B from using subcontractors to perform any part of its work without prior written consent from DMG.

44. DMG fully performed under the Agreement by providing L&B work related to the Project and paying L&B.

45. L&B materially breached the Agreement when it employed subcontractors to perform work on the Project without obtaining DMG's express written consent.

46. DMG has been damaged by the breach in an amount to be proven at trial, but which exceeds $75,000.

**COUNT TWO**
**FRAUD**

47. DMG restates and realleges the foregoing paragraphs as if fully restated herein.

48. L&B made false statements to DMG through the Proposal, estimates, and invoices submitted to DMG related to the Project. L&B intentionally and grossly overstated the work it would perform and supposedly did perform in the Proposal, estimates, and invoices to mislead DMG into overpaying L&B more than it was entitled to and far more than the actual cost of the labor, materials, and other work it provided for the Project.

49. L&B knew that the costs stated in its Proposal, estimates, and invoices were false, but nevertheless provided them to DMG to receive substantially greater funds than it was entitled to for its work on the Project.

50. L&B's false statements were material—indeed, central—to DMG's payments to L&B for the Project (and UPS's payment to DMG for the Project).

51. DMG justifiably relied on L&B's misstatements to obtain the right to perform on the Project and, later, to charge UPS for the work performed.

52. As a result of such fraud, DMG has suffered damages in an amount to be proven at trial, but which exceeds $75,000.

**COUNT THREE**
**PROMISSORY ESTOPPEL**

53. DMG restates and realleges the foregoing paragraphs as if fully restated herein.

54. L&B clearly and unambiguously promised DMG that it would not employ subcontractors to perform its work.

55. L&B knew or should have expected that its promise would induce reliance by DMG.

56. In reliance on L&B's promise, DMG entered the Agreement with L&B and, later, assigned performance of the Project to L&B.

57. L&B failed to fulfil its promise to perform work for DMG clients itself.

58. As a result of L&B's failure to honor its promise to DMG, DMG has been damaged in an amount to be proven at trial, but which exceeds $75,000.

**COUNT FOUR**
**UNJUST ENRICHMENT**

59. DMG restates and realleges the foregoing paragraphs as if fully stated herein.

60. When DMG assigned the Project to L&B and paid L&B for the work it claimed to have performed, DMG conferred a benefit upon L&B.

61. It is unjust for L&B to retain the benefits of the payments DMG made for the Project while simultaneously failing to perform the work itself and not having performed much of the work for which DMG paid.

62. As a result of L&B's actions, DMG has been damaged in an amount to be proven at trial, but which exceeds $75,000.

**WHEREFORE**, Plaintiff Divisions, Inc. d/b/a Divisions Maintenance Group respectfully requests the following relief from this Court:

A. Pierce the corporate veil to hold Defendant Laviniu Buzle accountable for Defendants L & B Grounds Management Inc.'s conduct;

B. Enter judgment in favor of Plaintiff and against Defendants on all counts;

C. Award Plaintiff damages in an amount to be determined at trial, but no less than $75,000;

D. Award Plaintiff pre- and post-judgment interest as allowed by law;

E. Award Plaintiff reasonable attorneys' fees and court costs incurred in bringing this action, and interest as permitted by law; and

F. Such other and further relief which the Court deems just and proper.

Respectfully Submitted,

/s/ *Ryan W. Goellner*
Ryan W. Goellner (0093631)
Sarah B. Litteral (0102711)
FROST BROWN TODD LLP
301 E. Fourth Street, Suite 3300
Cincinnati, Ohio 45202
Tel: (513) 651-6800
Fax: (513) 651-6981
Email: rgoellner@fbtlaw.com

*Attorneys for Plaintiff*

**JURY DEMAND**

Plaintiff Divisions, Inc. d/b/a Divisions Maintenance Group hereby demands a trial by jury on all matters that may be so tried.

/s/ Ryan W. Goellner

0145225.0802947 4915-7836-5509v3